UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

WILLIAM BRAY MD,

    Plaintiff,

    v.

WECARE TLC, LLC,

    Defendant.

Case No. 4:17-CV-37 JD

## OPINION AND ORDER

This case arises out of a dispute between Plaintiff Dr. William Bray ("Dr. Bray") and Defendant WeCare TLC, LLC ("WeCare") over the scope of Dr. Bray's employment and the salary he received. Dr. Bray filed this suit in May 2017 asserting a state wage payment claim and a discrimination claim due to his military service. Now before the Court are the parties' cross-motions for summary judgment on the state claim and WeCare's motion for summary judgment on the discrimination claim. As explained below, the Court denies all pending motions for summary judgment.

## I. FACTUAL BACKGROUND

Dr. Bray is a physician and entered active duty service for the Air Force after obtaining his medical degree and completing his residency. After five years of active duty, Dr. Bray returned home and began serving in the Reserves, eventually settling in Lafayette, Indiana. WeCare is an onsite or near-site health center management company. It enters into provider agreements with doctors and medical staff to provide clinic hours where clients' (public and private employers) employee populations can receive medical services. In early 2012, WeCare recruited Dr. Bray and in February, offered him a position in a formal offer letter. [DE 23-3].

This February 2012 offer letter was for the position of Lead Physician at Subaru of Indiana Automotive Health Center ("Subaru").[1] The letter also included, in part, the following terms: 1) annual salary of $275,000; 2) "[s]cheduled 'in clinic' patient care hours of 32 hours per week" with the understanding that "in order to give quality service to [Subaru] there maybe [sic] occasional extra hours needed, but 'in clinic hours will be limited to 32'"; 3) four weeks paid time off for vacation and sick leave; and 4) two weeks paid time off for military obligations. *Id.* Dr. Bray and WeCare's CEO, Lynn Jennings, both signed the offer letter. *Id.*

On February 2, 2012, the parties entered into a Provider Contract Employee Agreement between Dr. Bray and WeCare ("2012 Agreement"). The 2012 Agreement states that WeCare has contracted with Subaru to provide it a provider "to perform certain medical services to the employees [of Subaru] . . . for 32 hours per week." [DE 23-4 at 1]. Dr. Bray and Judy Garber, WeCare's President, executed the agreement on February 21, 2012. *Id.* at 6.

Over the next year and half, Dr. Bray made regular requests for schedule modifications and time off due to his military duties, which he was afforded. [*See, e.g.*, DE 23-1 at 6; 26-5 at 2–4; 23-6]. In the summer of 2013, Dr. Bray was deployed overseas for approximately 90 days, and WeCare worked with Dr. Bray to ensure he met his military obligation and transitioned back to his regular duties upon returning. [DE 23-1 at 6–8; 26-5 at 2–4].

In late spring or early summer of 2014, Subaru notified WeCare that it was terminating its relationship with WeCare as its onsite healthcare provider. [DE 23-1 at 11–12; DE 23-21 at 4]. As a result, WeCare terminated the employment of some employees and reassigned others to different clinics. *Id.* Ms. Garber testified that when Subaru ended its contract, WeCare notified all its staff at the Subaru center, including Dr. Bray, and informed them that because of this

---

[1] The offer letter also states the existence of a second offer letter of stock ownership in WeCare; however, this second letter has not been submitted to the Court by either party. [DE 23-3].

2

termination they would not continue with their employment in that clinic and should they be interested in further employment, WeCare would help them or place them at other clinics. [DE 23-21 at 4]. When Dr. Bray learned of this, he began to search for a job and took a few interviews. [DE 23-1 at 13].

WeCare sent Dr. Bray a letter dated June 25, 2014 ("June 2014 offer letter"), explaining "a few options for [his] continued employment with WeCare" and asking him his thoughts on those options. [DE 23-12]. In that letter, WeCare proposed that Dr. Bray work at a facility in Monticello for two days a week and at a facility in Plymouth for one day a week, with the other two days of the week spent "performing in [his] role as Medical Director" (interchangeably referred to as Chief Medical Officer ("CMO")). *Id.* He would also be called upon to travel to other clinics to conduct trainings. *Id.* This letter did not mention compensation. WeCare's CMO duties included participating in quarterly meetings, overseeing medical director meetings, helping review medical policies and procedures, reviewing any information that comes down from the CDC concerning airborne conditions or similar matters, communicating with other physicians regarding audit deficiencies, reviewing the charts of other medical providers, traveling to different WeCare clinics, training WeCare's healthcare providers, and assisting in opening new clinics. [DE 23-1 at 21; DE 23-21 at 3].

On July 9, 2014, Dr. Bray responded to WeCare's offer letter, stating, "[o]f course I am accepting of my new role, thank you." [DE 23-13 at 1]. He also indicated he had questions and listed some follow-up topics for discussion. *Id.* The parties did not execute a formal written agreement at this time, however, Dr. Bray assumed the CMO position and began his new clinic hours, while receiving the same annual salary and benefits as delineated in the 2012 Agreement. By January 2015, Dr. Bray's schedule was modified to two days a week at the Monticello clinic,

one day at the Plymouth clinic, and a half-day at the Logansport clinic. [DE 23-1 at 15]. The Logansport clinic later requested that Dr. Bray become available for a full, 8-hour clinic day, but WeCare did not want to pull Dr. Bray away from his administrative work. *Id.* at. 16; [DE 23-14 at 2]. In May 2015, Dr. Bray requested additional compensation for his travel expenses and wear and tear on his car. WeCare agreed to pay him $200 a month for the wear and tear and provide him with a credit card for gas and oil changes. [DE 23-1 at 16; 23-15].

On November 23, 2016, Dr. Bray informed WeCare that he was resigning from his CMO position because he had accepted a position to be the next commander of the 181st Medical Group, which would increase his military obligations. [DE 23-17]. Dr. Bray explained he can continue to serve in this role as needed until December 31, 2016. *Id.* He also indicated that he was committed "to honor all aspects of my employment agreement, including present care to MASE and LCSC clients." *Id.* Ms. Garber followed up with Dr. Bray via telephone to clarify, and he explained to her he was not taking a general leave of absence, but rather his "increased responsibility in the military" meant he was "stepping aside as chief medical officer" but he would "continue to honor everything else." [DE 23-1 at 19; DE 23-21 at 8].

On January 6, 2017, WeCare notified Dr. Bray that his compensation and benefits would be altered due to his title and job duty change. [DE 23-18]. The email stated that Dr. Bray's hours have changed from 40 to 29, including 28 clinical hours and one hour of drive time. Additionally, because of his hourly rate, his salary has changed to $199,375 per year. *Id.* Dr. Bray responded to this email on January 20, 2017 objecting to the change in his salary. [DE 23-19]. In his response, he indicated that an "hourly rate" has never been discussed. Dr. Bray asserted that his 2012 Agreement with WeCare had never been modified, including the compensation terms, and it automatically renewed for successive years. *Id.* In support of this, Dr.

Bray pointed to the contractual language that requires a written amendment signed by both parties and stated no such amendment had occurred. *Id.* Ultimately, Dr. Bray filed this action on May 5, 2017 [DE 1], and subsequently submitted his letter of resignation to WeCare on September 1, 2017 [DE 23-20].

## II. STANDARD OF REVIEW

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of [a] genuine issue of material fact." *Id.* at 323. Once the moving party meets this burden, the nonmoving party may not rest on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be *material*, which means that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, No. 4:08-CV-69, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010). And relevant to claims addressed in this opinion, "[i]f the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary

5

judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996). Finally, in a case involving cross-motions for summary judgment, each party receives the benefit of all reasonable inferences when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

### III. DISCUSSION

Dr. Bray asserts claims against WeCare under the Uniformed Services Employment and Reemployment Act of 1994 ("USERRA"), 38 U.S.C. § 4311, and the Indiana Code's Wage Payment Statute, I.C. § 22-2-5-1 *et seq*. and I.C. § 22-2-9-1 *et seq*. His claims each arise out of WeCare's decision to reduce his salary upon his resignation as WeCare's CMO. First, Dr. Bray's complaint alleges WeCare violated USERRA because it discriminated against him by way of an adverse employment action against him on account of his membership to a uniformed service. Second, WeCare failed to pay Dr. Bray all wages earned in violation of I.C. § 22-2-5-1 because his position as CMO was not previously compensated and therefore his resignation should not have impacted his wages. WeCare has moved for summary judgment on both claims. Dr. Bray has cross-moved for summary judgment on the state law claim and argues the USERRA claim should proceed to trial. Those motions are fully briefed, and the Court addresses each claim in turn.

### A. Indiana's Wage Payment Statue Claim

The Court begins with Dr. Bray's second claim, namely that WeCare has failed to pay his wages earned for his work from January 1, 2017 to November 1, 2017 due to WeCare's decision to reduce his salary upon resigning from his position as CMO in violation of Indiana's Wage Payment Statute.[2] WeCare moved for summary judgment on this claim arguing Dr. Bray is not

---

[2] The Court's jurisdiction on this claim is based upon 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over a state law claim that is closely related to the federal claim in a case.

entitled to wages for work he has not earned and when he voluntarily resigned from CMO, he was no longer entitled to the wages for the time previously allocated for that work. Dr. Bray cross-moved for summary judgment on this claim, arguing the 2012 Agreement was still the operating contract between the two parties at the time he resigned from the CMO position and under that agreement, he was not being compensated for his work as CMO, so therefore his resignation from that position should not have caused any modification to his salary.

Indiana's Wage Payment Statute provides an avenue for relief to employees seeking unpaid wages who voluntarily leave their employment or who remain employed and whose wages are overdue. *Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 646 F.3d 487, 490 (7th Cir. 2011); *Walczak v. Labor Works-Ft. Wayne LLC*, 983 N.E.2d 1146, 1154 (Ind. 2013). The statute provides that an employer "shall pay each employee at least semimonthly or biweekly, if requested, *the amount due* the employee." I.C. § 22–2–5–1(a) (emphasis added). This section later provides that "[p]ayment shall be made for *all wages earned* to a date not more than ten (10) days prior to the date of payment." *Id.* Because Dr. Bray filed this action while he was a current employee and ultimately left his employment at WeCare voluntarily, the Wage Payment Statute is the proper wage statute for this Court to use in reviewing his claim. *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 705 (Ind. 2002) (In a similar Indiana statute, "the Wage Claims Statute references employees who have been separated from work by their employer and employees whose work has been suspended as a result of an industrial dispute."). To recover under the Wage Payment Statute, Dr. Bray must qualify as an "employee" of WeCare. *Snell v. C.J. Jenkins Enterprises, Inc.*, 881 N.E.2d 1088, 1091 (Ind. Ct. App. 2008). Neither party disputes that Dr. Bray was an employee of WeCare.

The Wage Payment Statute does not define "wages," but case law provides guidance in determining the substance of compensation. The Wage Claims Statute does define wages as "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece or commission basis, or in any other basis, or in any other method of calculating such amount." I.C. § 22–2–9–1(b). "To qualify as a wage, the compensation must be connected to the work performed by the employee." *Wank v. Saint Francis Coll.*, 740 N.E.2d 908, 912 (Ind. Ct. App. 2000). "The defining characteristic of present compensation, with regard to an employee's hourly or salaried wage, is that it vests upon the performance of labor without any additional requirements . . . [and] is immediately entitled to a share of his present compensation when labor is performed." *Swift v. Speedway Superamerica*, LLC, 861 N.E.2d 1212, 1214 (Ind. Ct. App. 2007) (internal citations omitted). Employee compensation and payment arrangements vary widely, and no Indiana case has defined the term "earn" for purposes of the Act. *Sheaff Brock Inv. Advisors, LLC v. Morton*, 7 N.E.3d 278, 286 (Ind. Ct. App. 2014); *see also Highhouse v. Midwest Orthopedic Inst., P.C.*, 807 N.E.2d 737 (Ind. 2004). When a wage is earned is a fact-sensitive determination. *Sheaff Brock*, 7 N.E.3d at 287.

The Court notes that Dr. Bray did not bring a breach of contract claim. "The [Indiana Wage Payment Statute] applies only to wages which have already been earned and are due and owing at the time of discharge. The statutory penalties cannot be assessed for sums recovered as damages for breach of the employment contract." *New Frontiers, Inc. v. Goss*, 580 N.E.2d 310, 312 (Ind. Ct. App. 1991). However, in order to determine whether Dr. Bray is in fact entitled to *wages earned* for the time period he remained employed at WeCare but after WeCare reduced his salary, the scope of Dr. Bray's employment and what work he was compensated for is a

material fact to the claim. The question therefore becomes was Dr. Bray *earning* his salary, in part, for his work as CMO—a question the parties significantly dispute. This material fact requires interpretation of the agreements between the parties. WeCare argues the 2012 Agreement does not govern the scope of his employment as it was modified by the June 2014 offer letter and Dr. Bray's subsequent acceptance of his new role, which includes the role of CMO to account for two days of his five day work schedule. Dr. Bray argues the 2012 Agreement was never modified and controls the scope of his employment, which does not include his responsibilities as CMO. He asserts his hours did not change after he resigned from CMO and his $275,000 salary always only included his part-time clinical work, which continued when he stepped aside as CMO. The Court finds that a genuine issue of material fact exists as to the scope of Dr. Bray's employment and the basis of the compensation he was earning at the time of his CMO resignation.

First, the Court looks to the agreements between the parties. The 2012 Agreement calls for its interpretation in accordance with Florida law. [DE 23-4 at 5]. Since Dr. Bray argues this agreement is controlling and WeCare argues this agreement was modified with the June 2014 offer letter and acceptance, the Court interprets both agreements under Florida law.[3] Contract interpretation is a question of law which is governed by the parties' intention and "the best evidence of intent is the contract's plain language." *Whitley v. Royal Trails Prop. Owners' Ass'n, Inc.*, 910 So. 2d 381, 383 (Fla. Dist. Ct. App. 2005). If a contract is unambiguous and clear, it must be interpreted in accordance with its plain meeting. *Walsh v. Walsh*, 262 So. 3d 212, 216 (Fla. Dist. Ct. App. 2018). However, if a contract "is reasonably susceptible to more than one

---

[3] While the contract interpretation is under Florida law, Dr. Bray is still afforded the protections of the Indiana Wage Payment Statute because it only requires an employer to be "doing business in Indiana" for it to be bound under the statute. I.C. § 22-2-5-1. It is undisputed that WeCare was doing business in Indiana at the time of Dr. Bray's employment.

interpretation, it is ambiguous." *Id.* If a court decides that a contract is ambiguous, however, the interpretation becomes "a question of fact requiring the submission of extrinsic evidence to show the intent of the parties when the contract was drafted." *Id.*

The Court finds the 2012 Agreement to have latent ambiguities. *See Famiglio v. Famiglio*, 279 So. 3d 736, 740 (Fla. Dist. Ct. App. 2019); *Morrison v. Morrison*, 247 So. 3d 604, 607 (Fla. Dist. Ct. App. 2018) ("A latent ambiguity arises when the language in a contract is clear and intelligible, but some extrinsic fact or extraneous evidence creates a need for interpretation or a choice between two or more possible meanings.") (internal quotations omitted). The recitals of the agreement state that WeCare contracts with Subaru to provide it with an Employer Provider (here, Dr. Bray) "to perform certain medical services to the employees of such Employer and/or their dependents, for 32 hours per week." [DE 23-4 at 1]. This language is reasonably susceptible to more than one interpretation. As Dr. Bray argues, it could be interpreted to mean the scope of his employment with WeCare is limited to 32 hours of medical services to Subaru in exchange for his $275,000 annual salary and any occasional additional hours Dr. Bray worked were "extra hours" beyond the scope of his agreement and uncompensated. In contrast, it is reasonable to interpret the 32 hours of medical services to describe the requirement that WeCare has contracted to provide Subaru and only refer to Dr. Bray's "clinical hours" and not other administrative hours. The rest of the agreement does not refer to 32 hours or any other time commitment required of Dr. Bray. While the agreement is silent as to 40 hours a week or reference to "full-time," the 32 hours of medical services can also be interpreted as just "clinical hours" as that was all that was required by Subaru and WeCare's contract, which is explicitly referred to in the agreement.

In Article II, the 2012 Agreement discusses compensation. *Id.* at 3. The language states: "In exchange for the provision by [Dr. Bray] of Medical Services pursuant to this Agreement, WeCare shall pay [Dr. Bray] a fee of $275,000 annually for Medical Services provided by [Dr. Bray]. *Id.* However, in the same paragraph, it states "[t]he payment by WeCare of any compensation to [Dr. Bray] is expressly conditioned upon [Dr. Bray] preparing and submitting to WeCare accurate and complete time records *documenting separately all time spent by [Dr. Bray] in providing Medical Services pursuant to this Agreement*." *Id.* (emphasis added). This language can reasonably be interpreted to mean Dr. Bray's time was also spent attending to tasks outside the 2012 Agreement's definition of medical services, such as administrative duties. If the entirety of his workweek was providing medical services at Subaru, there would be no need for the contract to separately document those hours from other hours. Again, this agreement language is reasonably susceptible to more than one meaning. Whether or not Dr. Bray was contracted as a full-time employee or as a part-time employee is material to the scope of his employment and whether he was earning his salary, in part, for his time as CMO. While this agreement is silent on his position as CMO, it is also silent as to all administrative work, and, as explained above, could reasonably be interpreted as only pertaining to the clinical requirements of his employment. It is also undisputed that before Dr. Bray became CMO, he did spend some of his time during the week doing administrative work, however, whether that was required, and therefore compensated work, is disputed by the parties. *Id.* at 1; [DE 32 at 5; 27 at 3–4]. Additionally, the 2012 Agreement also does not mention any of the new clinics he provided services to after Subaru terminated its contract with WeCare. Accordingly, the Court finds the 2012 Agreement ambiguous as to the scope of Dr. Bray's employment and what was required of him to earn his salary at the time he resigned as CMO.

WeCare asserts the 2012 Agreement was modified by the parties because it became impossible to perform as it was materially based on the Subaru contract with WeCare, which was ultimately terminated. The modified agreement between the parties, as asserted by WeCare, was memorialized by the June 2014 letter which proposed that Dr. Bray perform three days of clinical work (later adjusted to three and a half) and two days fulfilling his duties as CMO. [DE 23-12]. The 2012 Agreement states that it "shall not be amended or waived, in whole or in part, except in writing signed by both WeCare and [Dr. Bray]." [DE 23-4 at 5]. Under Florida law, while parties can discharge or modify portions of a written contract between them, whether such a modification is valid is generally a question of fact. *See St. Joe Corp. v. McIver*, 875 So. 2d 375, 381–82 (Fla. 2004) (collecting cases); *Lake Sue Dev. Co. v. Keewin Real Prop. Co.*, 950 So. 2d 1280, 1284 (Fla. Dist. Ct. App. 2007) ("whether [subsequent] conduct does in fact result in a modification is . . . a question of fact"). The Court does not reach a conclusion as to whether the 2012 Agreement was modified as it is a question for the jury. However, the Court does note that even if the June 2014 offer letter and acceptance were a proper modification of the 2012 Agreement, it would still conclude it was ambiguous as to Dr. Bray's scope of employment and compensation, which is the material fact necessary under his Wage Payment claim.

While the June 2014 offer letter described the breakdown of Dr. Bray's workweek, including two days for CMO responsibilities, the offer letter welcomed "thoughts and feedback concerning this role." [DE 23-12]. In Dr. Bray's response, he was "accepting of [his] new role" but indicated he had questions and proposed a list of discussion topics regarding the offer. *Id.* This list included "[e]xpansion of medical director role/time" and "[f]ollow up on status of offer letter regarding stakeholder position in company." *Id.* A written resolution of these topics was not submitted to the Court. Further, the offer letter is silent as to Dr. Bray's compensation for this

"new role." The parties conduct exhibits that the compensation did not change until Dr. Bray resigned from his position as CMO, however, the letter does not explain whether his salary is for his clinical work only, or also his responsibilities as CMO. Additionally, when Dr. Bray's three days of clinical work changed to three and a half, there was no documentation of whether this adjustment in allocated time impacted compensation or CMO responsibilities. Rather, the only evidence available to the Court is competing deposition testimony. While the Court does not reach whether this exchange constitutes a modification of the previous 2012 Agreement, or perhaps a new contract in its entirety, it is reasonable for this offer letter and acceptance to be interpreted in more than one way when ascertaining the scope of Dr. Bray's employment.

Ultimately, the 2012 Agreement and the June 2014 offer letter and acceptance themselves do not definitively resolve whether or not Dr. Bray was being compensated for his role as CMO due to their latent ambiguities. Accordingly, the parties may offer extrinsic evidence as to the scope of employment. *Duval Motors Co. v. Rogers*, 73 So. 3d 261, 265 (Fla. Dist. Ct. App. 2011) (Extrinsic evidence "may be considered only when the contract language contains a latent ambiguity."). Unless that extrinsic evidence establishes the parties' intent beyond dispute, though, their meaning is a question of fact for the jury to resolve. *See Land O'Sun Realty Ltd. v. REWJB Gas Invs.*, 685 So. 2d 870, 872 (Fla. Dist. Ct. App. 1996). That is the case here, as none of the extrinsic evidence the parties offer resolves this question conclusively.

Prior to signing the 2012 Agreement, the parties executed an offer letter that states Dr. Bray would be "[s]cheduled 'in clinic' patient care hours of 32 hours per week. It is understood that in order to give quality services to [Subaru] there maybe [sic] occasional extra hours needed, but 'in clinic' hours will be limited to 32." [DE 23-3]. The parties dispute whether the 2012 Agreement establishes that Dr. Bray worked a 32-hour workweek with occasional

uncompensated extra hours or that Dr. Bray worked 32 "clinical hours" at Subaru but was expected to work a 40-hour workweek in total. While this letter may support the interpretation of 32 clinical hours only as opposed to a 32-hour workweek, it is not undisputed. Dr. Bray argues he never worked a 40-hour workweek and he was always part-time—working 32 hours a week. [DE 27 at 2; DE 33 at 2]. This argument, however, is contradicted by his own testimony where he said he worked "full-time." [DE 23-1 at 3]. He went on to describe what he means as full-time: "[F]ull-time is full-time. Seven days a week I could be doing work in the electronic medical record. Looking at labs, answering phone calls, even time away from the clinic I was getting calls to, you know, go in and do a refill or check a lab or go -- at times, do work at another client." *Id.* Yet his affidavit states that during his employment, "only under rare and extreme circumstances did [he] devote a full five-day workweek to [his] duties for WeCare." Notably, in his letter of resignation from WeCare in September 2017, Dr. Bray stated he is "resigning [his] position as a *full time* WeCare physician." [DE 23-20] (emphasis added). Dr. Bray's testimony and the evidence is inconsistent as to whether he considered himself a full-time employee.

To further add to the disputed facts, WeCare has submitted evidence that throughout his employment, it treated Dr. Bray as a full-time, five-day-a-week, 40-hour a week employee. WeCare provided paid time off and holiday pay on a 40-hour workweek accrual basis both before and after the Subaru-WeCare contract terminated. [DE 23-1 at 19–21; 32-1]. WeCare also provided Dr. Bray long-term and short-term disability coverage over that time, which WeCare explained was "available only for employees scheduled to work 40 hours a week or more." [DE 23-1 at 19; 23-18]. Additionally, Ms. Garber testified that Dr. Bray has been

performing 40 hours' worth of work per week since the beginning of his employment. [DE 23-21 at 6–7].

The June 2014 offer letter describes Dr. Bray's new role to include "two days [] performing in [his] role as Medical Director." [DE 23-12]. While it may be reasonable to conclude this would mean it is part of Dr. Bray's responsibilities required to earn his salary, Dr. Bray accurately argues there is conflicting evidence to this conclusion and rather, supports that he was never compensated for his CMO role. First, after he started in his new role, additional clinical duties were added to Dr. Bray's weekly hours, namely a half-day at a Logansport location. [DE 23-1 at 15; 23-14 at 1–3]. The parties do not dispute this half day was added to Dr. Bray's schedule. Dr. Bray notes the lack of evidence of any discussion as to how these additional clinical duties would impact Dr. Bray's responsibilities as CMO. If the June 2014 offer letter had modified the 2012 Agreement, this additional half day of clinical responsibilities would have displaced part of his time required as CMO and potentially would have required another modification. There is evidence that WeCare did not want all of Dr. Bray's time "wrapped up in clinical" or "tie[d] up . . . in clinical." [DE 23-14 at 2]. But the evidence does not resolve whether these new responsibilities impact his duties as CMO.

Additionally, Ms. Garber testified that Dr. Bray did not receive an increase in compensation for his role as CMO "[b]ecause part of his initial package was that he was going to get an interest in the company and his sweat equity would be his medical directorship, and being CMO would compensate for him getting that without paying any fee to get stock in the company." [DE 23-21 at 4]. Dr. Bray argues that this admission establishes that it is undisputed that he was not being compensated for his responsibilities as CMO. However, the Court does not agree. In the same deposition, Ms. Garber testified Dr. Bray's compensation did not change after

15

Dr. Bray took on his new role because WeCare filled the remaining hours outside his clinical work with additional administrative time such as his "medical director duties." *Id.* at 7. This can lead a reasonable jury to conclude that Dr. Bray was always a full-time employee, but with less clinical hours (24—eventually 28—hours down from 32 at Subaru) in his new role, and WeCare gave him the CMO position to reach 40 hours to justify his annual salary. The Court finds these portions of Ms. Garber's testimony, as well as the evidence described above, to be in conflict. It is not the Court's task to weigh this evidence or determine the truth of the matter. *See Austin v. Walgreen Co.*, 885 F.3d 1085, 1087 (7th Cir. 2018). The Court finds there is a genuine issue of material fact pertaining to whether Dr. Bray was a full-time employee being paid for his work as CMO before his salary was reduced and therefore, summary judgment must be denied.

The parties argue in their briefs about whether Dr. Bray's time spent driving to the various clinic locations are incorporated into the hours he worked per week. Dr. Bray argues his previous 32 hours of work was partially reallocated into driving time when his clinical hours were reduced in June 2014. When WeCare reduced his salary, it described his new hours as 29 which "includes 28 clinical hours and 1 hour drive time." [DE 23-18]. Contrary to Dr. Bray's argument, this fact does not prove his driving time should be reason for the Court to find he has earned wages that WeCare has failed to pay. The Court does not find this to be a material fact impacting whether Dr. Bray was compensated for his time spent as CMO.

Lastly, Dr. Bray argues that if he was being compensated for his CMO responsibilities, he continued to perform those duties after WeCare reduced his salary, and therefore, is owed wages for that unpaid work. Dr. Bray testified that despite his resignation as CMO, effective January 1, 2017, WeCare continued to assign him duties of CMO and held him out as CMO on the company's website. [DE 27-4 at 3, 5–7; 23-1 at 23]. Ms. Garber testified that if WeCare's

system assigned him charts or records to review after Dr. Bray was no longer CMO, it was in error and ameliorated once brought to WeCare's attention. [DE 23-21 at 3, 5]. She also testified that while tasks were inadvertently sent to Dr. Bray, he did not perform these duties as there were 200 charts left unreviewed. *Id.* at 3. Dr. Bray testified that he did review the charts he was assigned after his resignation. [DE 23-1 at 23]. Whether or not Dr. Bray performed CMO duties after his resignation was in effect is a material fact as to whether he earned wages that were unpaid. Based on the evidence submitted by the parties, this material fact is in dispute and precludes summary judgment.

Accordingly, the Court does not find summary judgment for Dr. Bray or WeCare on the Indiana Wage Payment Statute claim to be appropriate. Due to the cross-motions on this claim, the Court has construed all facts in the light most favorable to both parties and each have submitted evidence that a reasonable jury could find in favor of either party. The issue of whether Dr. Bray's salary was compensating him, in part, for his position as CMO is laden with contradictory evidence that can only be resolved by a trier of fact. This is a genuine issue of material facts because if Dr. Bray was not being compensated for his role as CMO, his resignation from that position had no bearing on his salary. To the contrary, if his salary encompassed compensation for those duties, his resignation and subsequent reduction in salary would not be a viable claim under the Wage Payment Statute, as he cannot seek wages under the statute he did not earn. Therefore, both motions as to this claim are denied.

### B. USERRA Claim

The Court next moves to Dr. Bray's claim that WeCare discriminated against him in violation of USERRA because it decreased his salary based on, at least in part, his military service. USERRA was enacted to, among other things, "encourage noncareer service in the

17

uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service ... [and] to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a)(1), (3). USERRA prohibits the denial of any benefit of employment[4] of a service member on the basis of that membership or obligation. *Id.* § 4311(a). An employer will be considered to have violated this statute if the person's membership or obligation for service in the uniformed services is "a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . ." *Id.* § 4311(c)(1). Courts have indicated that the statute reaches only discriminatory employment actions that provide military employees with fewer benefits. *See Sandoval v. City of Chicago*, 560 F.3d 703, 704 (7th Cir. 2009) ("[Section] 4311 is an anti-discrimination rule."); *Miller v. City of Indianapolis*, 281 F.3d 648, 650 (7th Cir. 2002) ("USERRA prohibits discrimination by, among other things, denying any benefit of employment on the basis of the employee's membership in the uniformed services.").

Under USERRA, the plaintiff bears the initial burden of showing, by a preponderance of the evidence, that the employee's military service was "a substantial or motivating factor" in denying him a benefit of employment. *Clune v. Desmond's Formal Wear, Inc.*, 2003 WL 21796388, at *6 (N.D. Ind. Feb. 4, 2003) (citing *Sheehan v. Dep't. of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001); *Miller v. City of Indianapolis*, 2001 WL 406346 (S.D. Ind. April 13, 2001), *aff'd*, 281 F.3d 648 (7th Cir. 2002)). Thus, to prevail on his claim, Dr. Bray need not show that his military obligations were the sole reason that his salary was reduced. It is sufficient if he

---

[4] "Benefit of employment" is defined as "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." 38 U.S.C. § 4303(2).

shows that WeCare was motivated in part by an impermissible factor. *Gillie-Harp v. Cardinal Health, Inc.*, 249 F. Supp. 2d 1113, 1118 (W.D. Wis. 2003). "When the employee has met this burden, the burden shifts to the employer to prove that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Clune*, 2003 WL 21796388, at *6 (citing *Sheehan*, 240 F.3d at 1014).

WeCare moves for summary judgment on Dr. Bray's USERRA claim, arguing WeCare continuously provided Dr. Bray with greater benefits than USERRA requires and there is no evidence Dr. Bray's military service was a motivating factor in WeCare's decision to alter his pay. WeCare argues it is undisputed it simply adjusted Dr. Bray's pay to reflect his reduced scope of work and argues it would have made the same decision regardless of the reason Dr. Bray stepped down from the CMO position. WeCare asserts USERRA does not create an obligation for it to pay Dr. Bray for work he is no longer performing. Dr. Bray does not cross-move for summary judgment on this count, but rather argues it should proceed to trial.

For Dr. Bray to prevail at trial, he would need to establish that the reduction in salary was a denial of a benefit of employment that was motivated by his military membership or obligation and WeCare would need to prove that the action would have been taken in the absence of such membership. *Id.* § 4311(c)(1). To meet the "motivating factor" standard, a plaintiff does not necessarily need a "direct admission from the employer." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 284 (7th Cir. 2015). He may rely instead on circumstantial evidence that creates a "convincing mosaic" from which a reasonable jury could infer discriminatory motive. *Id.* at 284 – 85 (citing *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (discussing the "convincing mosaic" route to proving discrimination); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736–37 (7th Cir. 1994) (same). "The factual question of discriminatory motivation or intent

may be proven by either direct or circumstantial evidence." *Sheehan*, 240 F.3d at 1014. A

discriminatory motive:

> may be reasonably inferred from a variety of factors, including proximity and time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared with similar work records or offenses.

*Id.* In the aggregate, these individual pieces might be enough to prove—or at least to create a

genuine issue about—the employer's ill motive. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635,

643–44 (7th Cir. 2013).

It is undisputed that Dr. Bray was a member of a uniformed service. The Court, however,

does find that a genuine dispute of material fact exists as to the motivating factor behind

WeCare's decisions to reduce Dr. Bray's salary. In part, this genuine dispute arises from the

analysis above regarding whether Dr. Bray's salary included compensation for his work as CMO

and whether WeCare's reduction in his salary was consistent with that scope of employment. If a

jury can reasonably find Dr. Bray's previous salary of $275,000 did not include compensation

for his work as CMO, and he is owed wages, the jury could reasonably find that WeCare's

alteration of his salary was motivated, in part, by his uniformed service obligations. Because of

this dispute, whether Dr. Bray was in fact denied a "benefit of employment" is also in dispute. If

Dr. Bray was denied "wages or salary for work performed"—the key material fact in dispute

pertaining to the state wage claim—then he was denied a benefit of employment as defined by

USERRA, and a jury would need to determine if that denial was in violation of the statute. 38

U.S.C. § 4303(2).

WeCare submitted evidence supporting its argument that it has gone above and beyond

what is required of it under USERRA, pointing to the scheduling modifications and paid time off

afforded to Dr. Bray for his military obligations. [DE 23-1 at 6; 26-5 at 2–4; 23-6]. In rebuttal, Dr. Bray presents the following circumstantial evidence to support his claim that his military services were, in part, a motivating factor in his salary reduction: 1) WeCare reduced his salary the week after his CMO resignation became effective because of his increased responsibility in the Reserves; 2) WeCare did not notify Dr. Bray of this reduction in salary until January 6, 2017, 44 days after he communicated his resignation as CMO; 3) the email explaining the reduction in salary and benefits specifically mentions "his new duties with the Air Force." [DE 23-18]. Additionally, Ms. Garber testified that Dr. Bray's "compensation" for his services as CMO was an ownership interest in the company. [DE 23-21 at 4]. Dr. Bray argues that if WeCare believed this to be true, the appropriate response to Dr. Bray's resignation from that role would be to "halt" his accrual of "sweat equity." [DE 27 at 19]. However, Dr. Bray testified WeCare took back all of his accumulated "sweat equity" from his work as CMO and gave him one dollar for his interest in the company. [DE 27-2 at 11]. And of course, on top of this, WeCare also reduced his salary as it claimed it was in part compensation for his role as CMO. Dr. Bray argues this action is inconsistent with the reason proffered by WeCare for his reduction in salary and benefits. The inconsistent actions, and reasons given for them, create an issue in dispute as to the motive of WeCare's decisions. WeCare has not presented any argument or evidence rebutting this fact. A reasonable jury could conclude that Dr. Bray's military status was a motivating factor in WeCare's decision to reduce Dr. Bray's salary after he notified it of his new position in the military. It is undisputed that WeCare granted Dr. Bray a considerable amount of flexibility with military leave during his tenure at the company. That fact will likely support WeCare's arguments before a jury, however, it does not negate an inference of discriminatory motive on summary judgment. *Arroyo*, 805 F.3d at 286.

Since Dr. Bray presented sufficient evidence to make a *prima facie* case of USERRA discrimination, the burden therefore shifts to WeCare to show that it would have reduced his salary regardless of his military service. *Id.* at 284–86. WeCare argues it would have reduced Dr. Bray's salary regardless of his reason for resigning as CMO because his obligations as CMO were within the scope of his employment and resigning from that position created a part-time employment for Dr. Bray, which his salary reduction reflected. While WeCare's belief in the scope of Dr. Bray's employment does not have to be accurate, it must be honest. *Gillie-Harp*, 249 F. Supp. 2d at 1123. However, because the Court has already concluded that a reasonable jury could find that WeCare's decision to reduce his salary was influenced by discriminatory factors, to prevail on summary judgment WeCare must show as a matter of law that Dr. Bray's resignation from CMO alone would have led to his reduction in salary. *Id.* As discussed above, the Court has found that WeCare has not met this burden and therefore, it is not entitled to summary judgment as a matter of law on the USSERA claim.

Accordingly, WeCare's motion for summary judgment is denied with respect to Dr. Bray's USERRA claim.

## IV. CONCLUSION

The Court DENIES Defendant WeCare's motion for summary judgment as to both claims in the complaint. [DE 21]. The Court also DENIES Dr. Bray's cross-motion for summary judgment as to the Indiana Wage Payment Statute claim. [DE 28].

SO ORDERED.

ENTERED: March 22, 2021

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court
